AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. **25mj0336**
Black "Redmi" Cell Phone )
DEA SSEE S001730176 )
("Target Device") )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C § 841(a)(1) | Possession of Cocaine with Intent to Distribute (Felony) |

The application is based on these facts:
See attached affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**EMANUEL ORTEGA** Digitally signed by EMANUEL ORTEGA
Date: 2025.01.16 10:19:29 -08'00'

*Applicant's signature*

Emanuel Ortega, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___Telephone___ *(specify reliable electronic means)*.

Date: 1/16/2025

*Judge's signature*

City and state: San Diego, California    Hon. Mitchell D. Dembin, U.S. Magistrate Judge
*Printed name and title*

# **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Black "Redmi" Cell Phone
>DEA SSEE S001730176
>("Target Device")

Target Device is currently in the custody of the Drug Enforcement Administration and located at 5810 Newton Drive, Carlsbad, California 92008.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, web history, files, metadata, photographs, audio files, videos, and location data, for the period of November 13, 2024, up to and including November 27, 2024:

- a. tending to indicate efforts to possess with the intent to distribute controlled substances within the United States;

- b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of or possession with the intent to distribute controlled substances within the United States;

- c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of or possession with intent to distribute of controlled substances within the United States;

- d. tending to identify travel to or presence at locations involved in the distribution of or possession with the intent to distribute controlled substances within the United States, such as stash houses, load houses, or delivery points;

- d. tending to identify the user of, or persons with control over or access to, the Target Devices; and

- f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violation of 21 U.S.C. § 841(a)(1).

# AFFIDAVIT

I, Emanuel Ortega, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device (**Target Device**):

> Black "Redmi" Cell Phone
> DEA SSEE S001730176
> ("Target Device")

as further described in Attachment A, and to seize evidence of a crime, specifically, violations of Title 21, United States Code, Section 841(a)(1), as further described in Attachment B.

2. The requested warrant is related to the investigation and prosecution of Jose Amador GONZALEZ-Alvarez ("Defendant" or "GONZALEZ") in *United States v. GONZALEZ-Alvarez* 24-CR-2724-BTM for a violation of Title 21, United States Code, Section 841(a)(1). The **Target Device** is currently in the custody of the Drug Enforcement Administration (DEA), located at 5810 Newton Drive, Carlsbad, California 92008.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I am a special agent employed by the Department of Justice, Drug Enforcement Administration ("DEA"). I have been employed as a Special Agent since 2022 and currently assigned to the San Diego Field Division, Narcotic Task Force. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7). Before joining DEA, I was employed as an agent with the United

States Border Patrol with the Department of Homeland Security ("DHS"). During my time as an agent with the Border Patrol, I served as a Task Force Officer ("TFO") for Homeland Security Investigation ("HSI") on the Maritime Task Force ("MTF") for approximately six years.

5. During my employment as an DEA Special Agent and in my positions as a Border Patrol agent and HSI TFO, I've conducted criminal investigations for numerous violations of federal and state laws including, but not limited to alien smuggling, narcotics smuggling, and organized criminal activity. I have conducted or assisted in investigations of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. I have participated in several controlled purchases of narcotics with the use of confidential informants (CIs) and have personally conducted hand-to-hand drug transactions while operating in an undercover capacity. I have participated in the execution of narcotic-related arrests and search warrants for violations involving controlled substances. Through these investigations, I have gained extensive knowledge from users of narcotics, sellers of narcotics, CIs and veteran narcotics detectives regarding the manner in which narcotics are sold, distributed, transported, stored and concealed. I am aware that it is common practice for narcotics traffickers to work in concert using cell phones. I am aware that narcotics traffickers frequently communicate with individuals responsible for importing concealed narcotics into the United States as well as with those distributing narcotics within the United States. For example, prior to the distribution of narcotics, narcotics traffickers frequently communicate with the transporters regarding arrangements and preparation for the narcotics distribution. When the distribution is underway, narcotics traffickers frequently communicate with the transporters to remotely monitor the progress of the narcotics, provide instructions, and warn accomplices about law enforcement activity.

6. In addition to my experience, I have received multiple formal trainings related to conducting narcotics investigations. These courses focused primarily on the identification of controlled substances, case management and development, managing CIs,

tactical street operations, undercover operations, surveillance operations, highway interdiction, hidden compartments, and various methods of drug trafficking.

7. I have conferred with other agents and law enforcement personnel who are also experienced in narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. I have included in parentheses or in brackets my explanations of coded or veiled speech, based on my training and experience, as well as my familiarity with the facts of this investigation.

8. Based upon my training, experience as a special agent, and consultation with law enforcement officers experienced in narcotics trafficking organizations, I am aware that:

   a. Drug traffickers use digital devices such as cell phones, tablets, and laptop computers because they are mobile and they have instant access to telephone calls, text, web, email and voice messages tending to indicate efforts to import and distribute controlled substances within the United States and between the United States and Mexico;

   b. Drug traffickers use digital devices such as cell phones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

   c. Drug traffickers and their accomplices use digital devices like cell phones, tablets, and laptop computers because they can easily arrange or determine what time their illegal cargo will arrive at predetermined locations;

   d. Drug traffickers use digital devices such as cell phones, tablets, and laptop computers to direct drivers to synchronize an exact drop-off or pick-up time of their illegal cargo;

   e. Drug traffickers use digital devices such as cell phones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units as well as the operational status of checkpoints and border crossings;

   f. The use of digital devices such as cell phones, tablets and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files,

3

call logs, address book entries, IP addresses, social network data, and location data;

g. Individuals involved in drug trafficking often use digital devices such as cell phones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, firearms, drugs, criminal proceeds, and assets purchased with criminal proceeds; and

h. Individuals involved in drug trafficking may use digital devices such as cell phones, tablets, and laptop computers to generate or save documents to track proceeds or inventory related to the movement of narcotics or drug proceeds and may visit websites to research or support false background stories in an attempt to create a front of a legitimate operation.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cell phones (including their SIM cards) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cell phone. Specifically, searches of cell phones of individuals involved in the importation of narcotics may yield evidence:

a. tending to indicate efforts to distribute controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in distribution of controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the device; and

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in narcotics-trafficking activities.

**FACTS SUPPORTING PROBABLE CAUSE**

10. On November 27, 2024, agents of the San Clemente United States Border Patrol Station were conducting anti-smuggling operation on Interstate 5 (I-5). The Border Patrol Agents were in a marked vehicle equipped with lights and sirens and in Border Patrol uniform with insignia and patches. The I-5 corridor is well known by law enforcement as a route to smuggle humans and illicit contraband into the United States. Due to this, Border Patrol Agents conduct interdiction along this corridor attempting to intercept narcotics, non-citizens without legal status, as well as enforcing bulk cash smuggling laws as part of their daily duties.

11. At approximately 12:16 p.m., United States Border Patrol Agent (BPA) Brandon Demark was observing northbound I-5 traffic, adjacent to the Las Pulgas freeway exit. BPA Demark was driving a marked U.S. Border Patrol vehicle equipped with emergency lights and siren. At this location, BPA Demark observed a blue Volkswagen Jetta (hereinafter Target Vehicle), bearing a Mexican license plate, drive by his location in the number two lane. In addition, BPA Demark observed a single male occupant inside the Target Vehicle. BPA Demark caught up to the Target Vehicle and immediately noticed the driver glancing at his mirrors to observe BPA Demark's marked vehicle. At this point, BPA Demark positioned his marked vehicle in the number three lane to observe the driver from the passenger side. As BPA Demark continued his observations, he noticed the driver had one arm locked out on the steering wheel and the Target Vehicle slow down to approximately 65 mph causing traffic to pass him. BPA Demark then pulled behind the Target Vehicle and observed as the driver was struggling to stay in his lane.

12. BPA Demark conducted a records check on the license plate of the Target Vehicle. Record checks revealed the following: the Target Vehicle had crossed the San Ysidro (SYS) Port of Entry (POE), at approximately 8:25 a.m. with a single occupant, Jose Amador GONZALEZ-Alvarez. BPA Demark noted the near four-hour delay in travel north from the SYS POE. Based on BPA's training and experience, people engaged in narcotics trafficking and human smuggling often delay their northbound travel to hide their immediate nexus to the border.

13. Follow-up records checks revealed GONZALEZ-Alvarez crossed into the United States on a Non-Immigrant Visitor Visa (B1/B2). B1/B2 Visa prerequisite is that individuals who intend to travel 25 miles north of the international border must obtain an Arrival/Departure record (I-94). At this point the Target Vehicle was approximately 60 miles north of the U.S./Mexico border. BPA Demark was able to identify GONZALEZ-Alvarez as the driver of the Target Vehicle based on international crossing and photograph record indices.

14. Based on the totality of the circumstances, BPA Demark initiated a vehicle stop which was conducted near the San Clemente Border Patrol Station. During the vehicle stop, BPA Demark identified himself as a Border Patrol Agent in the Spanish language. BPA Demark requested the driver's identification. The driver presented a B1/B2 Border Crossing Card. BPA Demark verified the driver as Jose Amador GONZALEZ-Alvarez. BPA Demark asked GONZALEZ-Alvarez about his travel itinerary. GONZALEZ-Alvarez stated he crossed the international border at approximately 8:00 a.m. and was in Chula Vista visiting his cousin prior to making the trip north.

15. Additionally, BPA Demark then asked GONZALEZ-Alvarez where he was going and GONZALEZ-Alvarez replied he was going to Las Vegas. BPA Demark asked GONZALEZ-Alvarez if he had a valid I-94 permit to which GONZALEZ-Alvarez replied he did not. BPA Demark asked GONZALEZ-Alvarez if he had anything illegal in the vehicle and GONZALEZ-Alvarez shook his head. BPA Demark re-asked the question to include narcotics. GONZALEZ-Alvarez stated that there was nothing illegal in the vehicle.

BPA Demark asked GONZALEZ-Alvarez for consent to search his vehicle with a canine. GONZALEZ-Alvarez consented to the search.

16. Subsequently, BPA Demark requested U.S. Border Patrol K-9-unit assistance. In addition, BPA Demark requested Supervisory Border Patrol Agent (SBPA) Jose Ortiz on scene. SBPA Ortiz is a native Spanish speaker. When asked, GONZALEZ-Alvarez said he was going to Las Vegas to visit his cousin. However, GONZALEZ-Alvarez said he did not have an address and would contact his cousin as he got closer to Las Vegas. SBPA Ortiz noted that GONZALEZ-Alvarez seemed nervous and was breathing heavily. In addition, SBPA Ortiz noticed that GONZALEZ-Alvarez's hands were shaking as he was holding a cup of coffee. GONZALEZ-Alvarez said he was staying in Las Vegas for a couple of days. SBPA Ortiz asked if GONZALEZ-Alvarez had any luggage to which he showed SBPA Ortiz an empty backpack. When asked if GONZALEZ-Alvarez had stopped anywhere else, GONZALEZ-Alvarez said Chula Vista to buy a couple of bottles of liquor.

17. At approximately 12:30 p.m., BPA Manuel Gomes with his K-9 partner arrived on scene. BPA Gomes asked GONZALEZ-Alvarez if he was the owner of the vehicle, to which he replied he was. BPA Gomes asked GONZALEZ-Alvarez if he could search his vehicle. GONZALEZ-Alvarez said, "Yes." BPA Gomes asked GONZALEZ-Alvarez if he had hidden people in the vehicle. GONZALEZ-Alvarez replied, "No." BPA Gomes asked GONZALEZ-Alvarez if he had anything illegal in the vehicle such as, marijuana, cocaine, methamphetamine, heroin, or ecstasy. GONZALEZ-Alvarez broke eye contact, looked away and said, "No." BPA Gomes asked GONZALEZ-Alvarez if he could conduct a sniff of the interior and exterior of the vehicle using his canine partner. GONZALEZ-Alvarez replied, "Yes."

18. Following the verbal consent given by GONZALEZ-Alvarez, BPA Gomes and his canine partner "Mya" conducted a sniff of the Target Vehicle. Mya is trained to detect the odors of methamphetamine, cocaine, heroin, marijuana, ecstasy and their derivatives. Mya alerted to the exterior of the Target Vehicle. After the canine alert, BPA

Demark opened the Target Vehicle's trunk and noticed a large taped up "Home Depot" cardboard box.

19. Subsequent to the positive canine alert, BPA Demark and Gomes cut open the cardboard box and discovered vacuum sealed bundles with yellow tape. Based on BPA Demark's training an experience, the vacuum sealed bundles were consistent with narcotics.

20. Border Patrol Agents located 25 packages which tested presumptively positive for cocaine. The packages weighed a total of approximately 31.05 kilograms.

21. At approximately 12:35 p.m., Border Patrol Agents placed GONZALEZ-Alvarez under arrest and charged him with violating Title 21, U.S.C., Section 841(a)(1), possession with intent to distribute cocaine.

22. The **Target Device** was found and seized by United States Border Patrol agents during an inspection and inventory of GONZALEZ-Alvarez's Volkswagen Jetta (Target Vehicle). The **Target Device** was situated on the front passenger seat inside of the Target Vehicle.

23. In a post-arrest interview, GONZALEZ-Alvarez waived his constitutional rights per *Miranda* and agreed to speak with DEA investigators at the San Clemente United States Border Patrol Station, DEA investigators asked GONZALEZ-Alvarez if the **Target Device** belonged to him, to which GONZALEZ-Alvarez replied, "Yes." GONZALEZ-Alvarez admitted to previously being paid to deliver a package to Los Angeles. This time, he said he was being threatened because he regularly crossed into the United States. He was given a box to transport. Although he claimed he did not know what was in the box, he thought it may be drugs.

24. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics-trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, email addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience

and training, there is probable cause to believe that the Defendant was using the **Target Device** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on November 13, 2024, up to and including November 27, 2024.

## METHODOLOGY

25. It is not possible to determine, merely by knowing the cell phone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cell phones and text message devices, can include cameras, can serve as personal digital assistants, and have functions such as calendars and full address books and can be minicomputers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cell phones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cell phone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cell phone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

27. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

28. Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

**CONCLUSION**

29. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of violations of Title 21, United States Code, Section 841(a)(1).

30. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A, seize the items listed in Attachment B using the above-described methodology.

1  I swear the foregoing is true and correct to the best of my knowledge and belief.

EMANUEL ORTEGA
Digitally signed by EMANUEL ORTEGA
Date: 2025.01.16 10:13:06 -08'00'

Emanuel Ortega
Drug Enforcement Agency, Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __16__ day of January, 2025.

Hon. Mitchell D. Dembin
United States Magistrate Judge

11